

# The University of the State of New York
## The State Education Department
### State Review Officer

No. 07-038

Application of a CHILD WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education

**Appearances:**
Educational Advocacy Service, attorney for petitioner, Anton Papakhin, Esq., of counsel

Hon. Michael A. Cardozo, Corporation Counsel, attorney for respondent, Daniel J. Schneider, Esq., of counsel

## DECISION

Petitioner appeals from the decision of an impartial hearing officer which found that petitioner had failed to establish the appropriateness of her son's unilateral placement at the Rebecca School for the 2006-07 school year and dismissed her request for payment of the cost of her son's tuition at the Rebecca School for the 2006-07 school year. The appeal must be sustained in part.

Petitioner's son was five years old and attending the Rebecca School at the time the impartial hearing commenced on November 9, 2006 (Tr. p. 255; Dist. Ex. 15).[1] The child was also receiving services from a private psychiatrist (see Tr. p. 115). The Rebecca School has not been approved by the Commissioner of Education as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7]). The child's eligibility for special education services as a student with

---

[1] I note that the record contains duplicative exhibits. For purposes of this decision, only District exhibits were cited in instances where both a District and Parent exhibit were identical. I remind the impartial hearing officer that it is his responsibility to exclude evidence that he determines to be irrelevant, immaterial, unreliable or unduly repetitious (see 8 NYCRR 200.5[j][3][xii][c]).

autism (see 34 C.F.R. § 300.8[c][1];[2] 8 NYCRR 200.1[zz][1]) is not in dispute in this appeal.

The child entered a preschool Montessori program when he was two and one-half years old and remained there for a year and one half (Dist. Ex. 19 at p. 2). The child attended respondent's P.S. 38 for four days of prekindergarten in September or October 2004, after which he did not continue (see Tr. pp. 243, 259, 260; Dist. Ex. 19 at p. 2). Petitioner reported that the school told her at that time that her son was not right for the class (Tr. p. 243; Dist. Ex. 19 at p. 2) and he reportedly had "temper tantrums and was not able to be controlled" (Dist. Ex. 15 at p. 2). The child was evaluated at the New York University Child Study Center (NYU) in November 2004, was diagnosed with an attention deficit hyperactivity disorder (ADHD) for which he was prescribed medication (id.). Petitioner home schooled the child from the time he left P.S. 38, until he enrolled in the Great Commission Christian School (GCCS) in January or February 2005 (Dist. Ex. 19 at p. 2; Tr. pp. 260-61, 322).

In October 2005, respondent's Committee on Special Education (CSE) reviewed a July 14, 2005 letter from the child's then psychiatrist (Dist. Ex. 17; Tr. p. 263). The psychiatrist indicated that the child's main deficit is in speech and language (Dist. Ex. 17). He concluded that the child did not meet the criteria for a diagnosis of autism, but considered the child to be in the high functioning range of children with Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS) (id.). The October 2005 CSE recommended that the child be classified as a child with a speech and language impairment and developed an individualized education program (IEP) for the child (Dist. Ex. 8 at pp. 1, 2).

The child remained at GCCS for the 2005-06 school year (Tr. pp. 322-23). However, petitioner testified that in March 2006 GCCS "was calling [her] all the time to come pick [her son] up because they were having a problem. They didn't understand what was happening to [him]…He was acting out" and that as a result, she began to explore a different placement for her son (Tr. p. 325). Petitioner testified that she spoke to "school based support team" staff at the public school in which she worked, spoke to her graduate program advisor, and to individuals from the public school to which the graduate program sent its students (Tr. pp. 241-42, 321, 324, 325, 326). She also testified that she identified, contacted, looked at, and visited different approved and unapproved New York State Schools including the Rebecca School (Tr. pp. 242-43, 245, 246, 247, 321, 322, 323, 325-26). With respect to the Rebecca School, petitioner first learned of the school on the internet in winter 2006, contacted the school in March or April 2006, took a tour of the school on April 5, and completed an application to enroll her son on April 19, 2006 (see Tr. pp. 245, 246, 274-75; Dist. Ex. 24).

---

[2] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all relevant events occurred prior to the effective date of the new regulations. However, for convenience, and unless otherwise specified, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

A private clinical psychologist conducted a psychoeducational evaluation of the child in March and early April 2006 (see Dist. Ex. 15). The evaluator interviewed petitioner, tested the child on three days, and observed the child in the child's school program on a separate day (id. at p. 1). Administration of the Wechsler Preschool and Primary Scale of Intelligence – Third Edition (WPPSI-III) yielded a Verbal IQ score of 67, a Performance IQ score of 57, and a Full-Scale IQ score of 56 (id. at p. 5). The evaluator indicated that because of the child's difficulty in cooperating and attending this was not a standard administration of the test and therefore these scores "probably understated [his] capacity to varying degrees" (id. at pp. 5, 6). The evaluator assessed the child's academic achievement with the WIAT-II which yielded results indicating that the child's academic and pre-academic skills were within the average range (id. at pp. 7-8). The evaluator concluded that based on the child's difficulty with language comprehension, attention, and to some extent phonetic decoding, his academic difficulties would increase as he moved from kindergarten to first grade and that he could "in no way manage the increasing language, conceptual and behavioral demands" (id. at pp. 7-8, 13-14). The evaluator noted weaknesses in the child's attention, concentration, frustration management, impulse control and sensory management (id. at p. 13). As a result, the evaluator concluded that the child needed constant redirection, structuring, limit setting, and one-on-one attention (id.). The evaluator determined that visual-motor integration tasks were manageable (id.). The evaluator concluded that the child demonstrated delays in language skills and in the areas of social interaction and play (id.). The evaluator indicated that the child had trouble managing feelings of frustration and anger, and concluded that he was not averse to affection or touch and had the capacity for attachment and enjoyment (id.).

The psychologist concluded that "a diagnosis of autism [was] appropriate" and that the condition did "not appear to be on the severe end" (id. at pp. 13, 14). She recommended a special therapeutic school for children with autistic spectrum disorders with a "quite small" classroom teacher ratio, "ideally" eight children to one teacher and three teacher assistants (id.). With any larger class, she recommended that the child have the assistance of a full time special education itinerant teacher (id.). She recommended a setting that would teach in short segments and modify instruction to the individual needs of the child, in this case providing petitioner's son with "a lot of" visual clues and reminders (id.). She indicated that the child would likely benefit from a more visual as opposed to phonetic approach to reading (id.). The evaluator also recommended continued individual speech-language therapy five times a week for 45 minutes to continue to develop the child's receptive and expressive language in all areas, continued individual occupational therapy three times a week for 45 minutes to work on fine motor skills and sensory management, continued work to expand and to develop the child's play at home and in the classroom, constant assistance to keep the child engaged in activities, use of time-outs when needed, and use of a reward system (id. at p. 15). The evaluator also recommended that the child's parents meet regularly with a child psychologist to obtain assistance in managing the child at home, as well as ongoing work with a psychiatrist to manage the child's medication and to explore adjusting the medication dosages for optimal effect (id.).

By notice dated April 18, 2006, respondent's CSE advised petitioner that an appointment had been scheduled for May 31, 2006 for a psychological assessment and an educational evaluation of the child (Dist. Ex. 18).

Petitioner's advocate sent a letter dated April 21, 2006 to the CSE requesting the child's case be "reopened" and that the CSE recommend an appropriate program for the child's 2006-07 school year (Dist. Ex. 16). The advocate's letter also indicated that petitioner had obtained a private psychoeducational evaluation and that it would be available in approximately one week (id.). The advocate advised the CSE that she would forward the evaluation to the CSE when she received it (id.).

Petitioner testified that she and her husband met with the private evaluator on May 7, 2006 and received a copy of the psychoeducational evaluation on that day (Tr. p. 307).[3] On May 12, 2006, petitioner visited the Rebecca School for an interview and the Rebecca School also videotaped a functional emotional assessment of the child (Tr. p. 281). The Rebecca School accepted the child by letter dated May 18, 2006 (Parent Ex. F; Tr. pp. 280-81). The acceptance letter advised petitioner that in order "to secure placement" for her son she would need to return the enclosed contract with a non-refundable deposit of $10,000 within two weeks (Parent Ex. F). Petitioner executed an enrollment agreement on May 30, 2006 and provided the Rebecca School with a check dated June 6, 2006 in the amount of $2,000 (Tr. p. 151; see Parent Ex. I).

By letter dated May 25, 2006, petitioner's advocate sent a copy of the private psychoeducational evaluation to the CSE and requested that the CSE reconvene at the earliest possible time to review the evaluation and to develop the child's IEP for the 2006-07 school year (Dist. Ex. 14).

In response to the receipt of the private psychoeducational evaluation, respondent's CSE sent petitioner a notice dated June 2, 2006 scheduling a CSE meeting for June 12, 2006 (Tr. pp. 365-66; Dist. Ex. 22).

The CSE met on June 12, 2006 (Tr. pp. 286, 288, 299, 302; Dist. Ex. 7). Petitioner requested that her son's classification be changed from speech and language impairment to autism and that he receive speech-language therapy and occupational therapy services over the summer (Tr. pp. 286-87, 354). In response to petitioner's requests, the CSE asked petitioner to provide a letter from a physician with a diagnosis of autism and documentation from the child's related services providers supporting summer services (Tr. pp. 354, 356, 357-58; Dist. Ex. 21 at p. 1). At this meeting, petitioner also advised the CSE that she was interested in an approved non-public school for her son (Tr. p. 380; Dist. Ex. 21 at p. 1). Petitioner did not communicate to the CSE that she had applied to the Rebecca School, that she had executed an enrollment agreement with that

---

[3] Petitioner testified on November 28, 2006 that she had received the private evaluation sometime in April 2006 (Tr. p. 230). At the commencement of the next day of testimony, which was December 6, 2006, petitioner's advocate indicated that petitioner had contacted her after her earlier testimony regarding the need to "correct" certain testimony that she had "discovered" was in error (Tr. pp. 305-06).

school, or that a deposit to secure her son's placement had been provided to the school (Tr. pp. 356-57). The CSE adjourned the meeting and determined to reconvene upon the receipt of the requested information. (Tr. pp. 354, 358, 401; Dist. Ex. 21 at p. 1)

The report from the child's occupational therapist, which was provided to petitioner's advocate on June 14, 2006, indicated that the child's sensory system fluctuated, resulting in sudden bursts of energy and/or sudden lethargy (Dist. Ex. 9 at p. 1). The occupational therapist reported that decreased sensory processing skills "greatly" impacted upon the child's ability to function in the classroom as well as in other environments (id.). She also reported that the child displayed "decreased fine motor skills and bilateral integration skills, decreased gradation of movement, and decreased visual motor abilities," that these delays "greatly" impacted on the child's academic performance, that the child's "self-directed behaviors" hindered his academic gains, and that transitions particularly "to novice (sic) or uncomfortable situations" proved difficult for him (id.). The occupational therapist also advised that missed occupational therapy sessions greatly impacted the child's ability to process sensory information, that he required sensory information to be given in continuity, and that "lapse in service provision will greatly hinder [the child's] daily functioning and will almost certainly result in a regression of skills" (id.). The child's occupational therapist advised that petitioner's son was currently receiving services on a ten-month basis and that it was "imperative that [he] receive services on a 12-month basis in order to maximize his sensory processing abilities, aid in transitions, and maintain the gains he has made in therapy thus far" (id.).

In a letter dated June 19, 2006 addressed to respondent, the child's current psychiatrist reported the child's symptoms to include "poor vocabulary, hyperactivity, and inattentiveness" (Parent Ex. C). He provided information with respect to the child's medication and indicated that the referenced symptoms were partially controlled as a result (id.). The psychiatrist reported that he had "reviewed" the private psychoeducational evaluation and agreed that the child's disorder "falls under autistic spectrum" (sic) and supported the private psychologist's recommendation that the child receive a special therapeutic school for children with autism (id.).

By letter dated June 29, 2006 to the CSE, petitioner's advocate enclosed a copy of the psychiatrist's June 19, 2006 letter and asked the CSE to reconvene to amend the child's classification (Dist. Ex. D).

Respondent's CSE met on July 6, 2006 (Tr. pp. 299, 359; Dist. Ex. 6 at p. 1). Petitioner attended the meeting in person; her advocate participated by telephone (Tr. pp. 372-73, 384, 477; Dist. Ex. 6 at p. 2). The CSE changed the child's classification from speech and language impairment to autism (Tr. pp. 291, 360, 371; Dist. Ex. 6 at pp. 1, 2).[4]

---

[4] While not a part of the record, documentation relevant to the child's need for summer speech-language services was also provided to the CSE (Tr. pp. 357-59, 360, 366).

5

The July 2006 CSE also developed an IEP which recommended that petitioner's son receive 12-month services, including speech-language therapy and occupational therapy during July and August 2006 (Dist. Ex. 6 at pp. 1, 16). The CSE also recommended that the student be placed in a special class in a specialized school with a student to teacher ratio of 6:1+1 and with related services of individual occupational therapy three times a week for 45 minutes and individual speech-language therapy five times a week for 45 minutes (id. at pp. 1, 5, 14). Because of the child's social/emotional management needs, the CSE also recommended that petitioner's son be provided with a full time one to one crises management paraprofessional (id. at pp. 4, 14, 16, 17). The IEP included goals and objectives in expressive language; pragmatic language; receptive language; oral motor awareness; writing; fine motor coordination; and mathematics, spelling, and decoding skills (id. at pp. 6-13). A document entitled behavior intervention plan was also a part of the IEP (see id. at p. 17).

At the July 2006 CSE meeting, petitioner did not did not communicate to the CSE that she had applied to the Rebecca School, that she had executed an enrollment agreement with that school, or that a deposit to secure her son's placement had been provided to the school (Tr. pp. 292, 364). Respondent's social worker, who attended the July 2006 CSE meeting, testified that petitioner did not indicate any dissatisfaction with the CSE's recommendations (Tr. p. 364). Petitioner stated "no," when asked during cross-examination "[w]as there any way that the CSE had of knowing on [that date] that you were dissatisfied with [its] recommendation" (Tr. p. 292). Petitioner also testified that she asked the July 2006 CSE where her son would go to school in September and expressed concern about whether her son would receive a placement (Tr. p. 453).

On August 11, 2006, petitioner executed a revised enrollment agreement with the Rebecca School, which indicated that the Rebecca School understands that she was pursuing funding through the Department of Education" and petitioner would keep the Rebecca School informed of the process (Parent Ex. G). The enrollment agreement provided that it could be cancelled by written notice withdrawing the student on or before August 30, 2006 and that the student could be dismissed from school if the school determined continued attendance was not in the student's best interest.(id.)

By due process complaint notice received by respondent on August 25, 2006, petitioner requested an impartial hearing regarding her son's 2006-07 school year (Dist. Ex. 1). Petitioner asserted that the CSE was not properly constituted and that the July 6, 2006 IEP was flawed for a number of reasons (id. at pp. 1, 2). For the first time, petitioner advised respondent that she was enrolling her son at the Rebecca School and would be seeking tuition payment from respondent. (id. at p. 2). Petitioner also sought the related services set forth in the July 2006 IEP as well as transportation to and from the Rebecca School (id.).

The impartial hearing commenced on November 28, 2006, continued on November 29, 2006, and December 6, 2006, and concluded on January 12, 2007. At the beginning of the impartial hearing, respondent's representative advised the impartial hearing officer that it was conceding prong one (Tr. p. 26). The impartial hearing officer

rendered a decision on March 12, 2007. He noted that respondent had conceded that it had not offered petitioner's son a free appropriate public education (FAPE)[5] for the 2006-07 school year (IHO Decision at p. 7). On that basis, he concluded that respondent failed to offer petitioner's son an appropriate program for the 2006-07 school year (id.). The impartial hearing officer also determined to give greater weight to the opinion of the physician who was the child's former psychiatrist than to the private evaluation and opinion of the child's current psychiatrist (IHO Decision at pp. 9-10; see also Tr. p. 263). Based on the fact that the previous psychiatrist had been the child's psychiatrist for "six months or more," had "clearly found that [petitioner's son] did not meet the criteria for Autistic disorder," and "more importantly ... [the psychiatrist's] opinion that placement of [petitioner's son] in a classroom with autistic children would be inappropriate," the impartial hearing officer determined that the child's placement in a classroom with autistic children at the Rebecca School was not appropriate (IHO Decision at p. 11). The impartial hearing officer did not reach the question of whether equitable considerations supported petitioner's request for tuition payment (id.). He also gave little weight to the psychoeducational evaluation report obtained by the parent after she attended the Rebecca School open house, in part because it recommended the exact 8:1:3 student to teacher staffing ratio that was utilized at the Rebecca School. He also gave little weight to the opinion stated in a letter by the child's then current psychiatrist because the psychiatrist did not indicate how long he had been treating the child. Neither of the authors of the reports testified at the impartial hearing. Based on the conclusion that petitioner had not established that the child's placement was appropriate, the impartial hearing officer dismissed petitioner's request for her son's tuition costs at the Rebecca School.

Petitioner argues on appeal that the impartial hearing officer exceeded his authority by raising the issue of the child's classification sua sponte and relying on outdated information. Petitioner further argues that the Rebecca School is appropriate to meet the child's needs. Petitioner argues, among other things, that (1) the Rebecca School provides the child with an appropriate class size of six children, provides individual occupational therapy and speech-language therapy as recommended by the private evaluator as well as the assistance of a one-to-one aide; (2) that the child receives necessary input through the appropriate use of the Rebecca School's sensory gym; (3) that the child receives instruction specific to his changing daily functional-emotional needs and receives a wide range of instructional activities; (4) that the Rebecca School works to increase the child's ability to be "regulated" and to "self-regulate," works to improve the

---

[5] The term "free appropriate public education" means special education and related services that -

(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401[9].

child's communication and interactions with others, and works to increase his fine motor and other relevant skills; and (5) the child has shown progress.

Petitioner also argues that the equities support her claim because she visited all the pubic schools recommended by respondent and demonstrated her willingness to place the child at public school if respondent offered an appropriate placement. She also asserts that the equities do not prohibit her from enrolling her son in a private school prior to a CSE meeting.

Respondent filed an answer asserting that petitioner has not established that the Rebecca School is an appropriate placement.

Respondent also contends that the equities do not support petitioner's claim. It asserts that the evidence shows that petitioner always intended to place the child in a private school on the basis of the payment made to the school prior to the CSE meeting and also that petitioner has not complied with either of the notice provisions of 20 U.S.C. 1412(a)(10)(C)(iii)(I). Respondent further asserts that petitioner refused to have the child evaluated and that petitioner did not timely provide the private psychoeducational evaluation to the CSE. Respondent also asserts that petitioner delayed the CSE's ability to determine a program and placement for the child.

The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482)[6] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d]; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; see Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 132 [2d Cir. 1998]). The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 531, 536-37 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a child by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim

---

[6] Congress amended the IDEA, effective July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 [2004] [codified as amended at 20 U.S.C. § 1400, et. seq.]). Since the relevant events at issue in this appeal occurred after the effective date of the 2004 amendments, the new provisions of the IDEA apply and citations contained in this decision are to IDEA 2004, unless otherwise specified.

(Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the child a FAPE (id.; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

The record supports the impartial hearing officer's finding that respondent conceded that it did not offer petitioner's son a FAPE for the 2006-07 school year (IHO Decision at p. 7; Tr. p. 26). I concur with the impartial hearing officer that petitioner therefore has prevailed with respect to the first Burlington criterion for an award of her son's tuition costs at the Rebecca School for the 2006-07 school year.

I must now consider whether petitioner has met her burden of demonstrating that the placement selected for the child for that school year was appropriate (Burlington, 471 U.S. 359; Application of the Bd. of Educ., Appeal No. 03-062; Application of a Child with a Disability, Appeal No. 02-080). The private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the child's special education needs (Application of a Child with a Disability, Appeal No. 04-108; Application of a Child with a Disability, Appeal No. 01-010). A parent's failure to select a program approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105).

Parents are not held as strictly to the standard of placement in the LRE as school districts are; however, the restrictiveness of the parental placement may be considered in determining whether the parents are entitled to an award of tuition reimbursement (Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21 [1st Cir. 2002]; M.S. v. Bd. of Educ., 231 F.3d 96, 105 [2d Cir. 2000]). However, this must be balanced against the requirement that each child with a disability receive an appropriate education (Briggs v. Bd. of Educ., 882 F.2d 688, 692 [2d Cir. 1989]). The test for a parental placement is that it is appropriate, not that it is perfect (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 84 [3d Cir. 1999]; see also M.S., 231 F.3d at 105).

I agree with petitioner that the impartial hearing officer improperly relied on the letter from the child's former psychiatrist to conclude that the Rebecca School was not an appropriate placement for petitioner's son for the 2006-07 school year.[7] In his letter, the

---

[7] Petitioner's argument goes too far, however, in her claim that the impartial hearing officer determined that the child was "erroneously classified as autistic" and that he sua sponte "removed" that classification from the child. A reading of the impartial hearing officer's decision indicates that the impartial hearing officer did not change the child's disability classification.

9

psychiatrist concluded that the child did not meet the criteria for autistic disorder, and recommended that the child not be placed in a classroom with autistic children. I note that this letter was dated almost a full year prior to the date of the July 6, 2006 CSE meeting. Upon reviewing the record as a whole, I disagree with the impartial hearing officer's conclusion that the opinion of the child's former psychiatrist is more persuasive than the supplemental opinion provided that was formulated more closely to the time the child was placed in the Rebecca School. I note also the July 6, 2006 CSE accepted the opinion contained in the private psychoeducational report and reclassified the child as a student having autism.

I have reviewed the record to determine the child's educational needs and reviewed the services provided at the Rebecca School to meet those needs, and for the reasons set forth below, I conclude that the Rebecca School is an appropriate placement for the child.

The child is reported to have a severe communication delay characterized by deficits in his receptive, expressive, and pragmatic language skills (Dist. Ex. 6 at p. 3). He is described as having a limited attention span, poor joint attending skills, and fleeting eye contact as well as being impulsive and having difficulty interacting socially and in play situations with children his age (id. at pp. 3, 4). The child presents with a fluctuating sensory system resulting in sudden bursts of energy and/or sudden lethargy that impact his ability to function in the classroom, home and community (Dist. Ex. 9 at p. 2). He has difficulty with transitions and changes in his routine and requires much redirection and structure (Dist. Exs. 9 at p. 2; 19 at p. 3). An occupational therapist treating the child prior to his enrollment in the Rebecca School reported that his sensory dysfunction and self-directed behaviors hindered his academic gains (Dist. Ex. 9 at p. 2). A recent psychoeducational evaluation of the child revealed that his academic skills are in the average range as measured by the WIAT-II with standard (and percentile scores) of 113 (81) in word reading, 99 (47) in numerical operations, and 99 (47) in spelling (Dist. Ex. 15 at pp. 8, 17).

The Rebecca School is described as "a therapeutic day school promoting the education and development of children with neurodevelopmental disorders of communicating and relating including PDD and autism" and incorporates academics, sensory integration, social skills training, "floor time," and behavior modification (Parent Ex. B at p. 1). According to a brochure describing the Rebecca School, it considers each child's functional emotional developmental level, how the child processes information, and the learning relationships that enable the child to progress (Dist Ex. 11 at p. 7). The Rebecca School focuses on a child's underlying capacity to relate and communicate, rather than behaviors and symptoms, to build on strengths and minimize limitations (id.). It considers individual variations in motor and sensory processing and tailors a program to each child's needs (id.). The program director of the Rebecca School testified that program staff look at each child's sensory system and learning style to determine "[w]hat do they need to be able to learn and move ahead" (Tr. p. 40). She explained that the sensory system relates to how an individual takes in information from the environment, such as where one's body is in space, how movement affects the body, or how one takes

10

in sound and when an individual is unable to process these stimuli the sensory system can "disregulate" (Tr. pp. 42-43). The program director testified that, at the Rebecca School, children exhibiting maladaptive or socially unacceptable behavior are viewed as trying to express something about the way they view the world and that the goal at the Rebecca School is to teach children to get what they want in a functional way so that they do not need to use maladaptive or socially unacceptable ways (Tr. p. 93). With respect to respondent's argument relating to the experience of the Rebecca School's teachers, I note that the testimony at the impartial hearing set forth the following: (1) the teachers at the school either have a master's degree or are enrolled in a master's degree program in special education or in education and they all have experience working with children on the autism spectrum (Tr. p. 38); (2) the teacher assistants have bachelor degrees and approximately half of them are enrolled in master's degree programs (id.); (3) all of the school's clinical staff which include occupational therapists, physical therapists, speech language pathologists, social workers, and psychologists are certified in their respective discipline (Tr. pp. 38-39); (4) the school typically looks to hire individuals with two years of experience working with children on the autism spectrum, preferably in a classroom setting, but working one-to-one in a home based setting would qualify an individual as well (Tr. p. 58); (5) both of the child's teachers have master's degrees; one in education and the other in psychology of education (Tr. pp. 183, 186-87, 206-07); (6) one of the child's classroom teachers has worked with children on the autism spectrum for two years in a one-to-one setting as well as in a clinical setting (Tr. p. 59); (7) both of the child's teachers have received the training required by the school as well as continuing in-service and case conferences (Tr. pp. 40-41, 125-28, 205-06, 211-12, 216-18, 219-22); and (8) a program employee providing one-to-one aide services for the child had participated in a comprehensive four day training program prior to her employment at the Rebecca School (Tr. p. 61).

Petitioner's son is enrolled in a class of six children who have diagnoses of either verbal apraxia or an autism spectrum disorder and are described as "higher functioning" children who all have some language (Tr. pp. 187-88). The class has two teachers and teacher assistants and the child is assigned a one-to-one paraprofessional (Tr. pp. 59, 185-186, 214). The child receives occupational therapy fives times per week and speech-language therapy four times per week (Tr. p. 200). The child also receives sensory input or sensory integration therapy, in a "sensory gym," hourly throughout the school day for approximately 15 minutes, which is provided to him by the occupational therapist or the trained assistants (Tr. p. 44).[8]

The child's classroom teacher testified that the children begin the school day with free play and a sensory activity that may include a sand or water table, shaving cream, beans, or an obstacle course (Tr. pp. 190-91). During this "floor time," the classroom staff are paired one-to-one with a child and follow the child's lead (Tr. pp. 191-92). Petitioner's son will join other children in an activity if it is an activity that he is interested in, will share, and with prompting will verbally request children play with him

---

[8] The program director of the Rebecca School described a sensory gym as a room with mats on the floors and walls containing swings, ball pits, and trampolines, which are used to provide sensory input (see Tr. p. 45).

(Tr. p. 192). A "morning meeting," at which time the teachers read to the children, follows the "floor time" (Tr. p. 191). The classroom teacher testified that petitioner's son actively participates in the "morning meeting," assisting the teachers with the reading, passing out objects to the children and interacting with them (id.). Each morning the children also leave the classroom for art, music, or gym as either a group or individually (id.). Later in the day, the children do more reading, as well as math and another sensory activity (id.). The classroom teacher testified that the children are on an "emerging" level of reading and the teacher and aides usually read to them (Tr. p. 195). Math instruction consists of learning shapes and basic adding; worksheets are not used (id.). She further testified that petitioner's son is very good at math when he participates, however it is difficult to see his capabilities because he is not always compliant and at times will tantrum (Tr. pp. 196-97).

Contrary to respondent's suggestion that the program did not have sufficient information relative to the child's needs for its program to provide him with educational benefits, as respondent admits, the school had the results of its "functional-emotional assessment scale," which is required by the school as part of its application process (Tr. p. 77). The record also indicates that the school asked for and received copies of other relevant documents relating to the child including previous IEPs, related services reports, and the private psychoeducational evaluation (see Tr. pp. 73-77). The program director of the Rebecca School testified that the child's program is individualized for him (Tr. p. 45). She stated that at times it is very difficult for the child to be in the classroom due to sensory overload so he leaves the classroom setting and works individually with his one-to-one aide following the same schedule (Tr. pp. 44-45, 46). When he is able to, he returns to the classroom setting (Tr. p. 45). She further testified that the child currently is on a schedule for the sensory gym which is continually monitored to determine if it is increasing his ability to concentrate, focus, and be in the classroom (Tr. p. 113). In addition to use of the sensory gym, when the child exhibits inappropriate behavior such as hitting, staff talks to him about using "gentle hands" and tries to determine if emotions are associated with his behavior asking him "are you angry" (Tr. p. 106). The program director testified that program staff work with the child so that he tells them when he is getting upset (Tr. p. 107) and that the child now has an increased ability to communicate with words rather than with behavior (Tr. p. 54). The classroom teacher testified that the program encourages the child's delayed expressive language through prompting (Tr. pp. 200-01). The program director also indicated that the school psychologist observes the child in the classroom to determine if and how counseling should be implemented into his program (Tr. p. 114).

At the time of the impartial hearing, the child had been attending the Rebecca School for approximately two months. The record indicates that petitioner's son has made improvements and progress across a number of dimensions. His classroom teacher testified that when the child started at the school he was working in an empty classroom with his one-to-one aide for the majority of the day, spent much time in the sensory gym "regulating himself," and exhibited aggression toward the teachers such as pushing and sometimes hitting and biting them when he did not want to participate in an activity (Tr. p. 197). She further testified that now, for almost a month, the child is in the classroom

approximately 85 percent of the time, displays minimal behavioral challenges, rarely becomes aggressive to other children, and is calmer (id.). Currently the child does not require a one-to-one aide and his teacher testified that most of his aggressive behavior has subsided (Tr. p. 189). His one-to-one aide is still assigned to him in case his behavior becomes difficult, but she divides her attention equally among all the children in the classroom (Tr. p. 214). The classroom teacher attributed these changes to the child's increased comfort level at the school and increased understanding of what is expected resulting from individualized attention provided by his one-to-one aide testifying, "she's [sic] always there to prompt him and assist him when he was having a breakdown" (Tr. pp. 198, 213). She also testified that the child is beginning to initiate interaction with other children and when he wants to participate in an activity that interests him, he will initiate play with another child (Tr. p. 189). The child is encouraged to interact with other children through prompting (Tr. pp. 192-93).

The program director of the Rebecca School, who sees the child at least once per day and sometimes two to three times each day, also testified that the child's language has improved, as has his ability to use his language to communicate (Tr. pp. 55, 130). She indicated that she has heard him talk about opposites, about academic activities, and that he tries to engage with another child (Tr. p. 105). Petitioner's son interacts with the children in his class, inviting them to come to the sensory gym with him and exhibits turn taking on the swing while there (Tr. pp. 53-54). She also indicated that the child has become more aware of when he requires sensory input and is more frequently able to participate in activities, especially in the larger group in the classroom (Tr. p. 55). She further testified that the child has learned to ask at times to go to the sensory gym "which is him saying that his body feels overloaded" (Tr. pp. 98, 100, 102-03). The program director stated that the child is now also better able to transition between activities (Tr. p. 131).

Petitioners testified that her son is talking more at school and at home and that in the past he would mumble more and "act out" because he was frustrated about not being able to express his needs quickly (Tr. pp. 255-56). She also testified that the child has increased his imaginary play and his social skills have improved (Tr. pp. 256, 310).

As indicated above, petitioner has provided sufficient information describing the daily activities of petitioner's son at the Rebecca School and petitioner did provide a written schedule showing the daily instructional activities for the child (see Parent Ex. H).

Respondent contends that petitioner placed the child in an unnecessarily restrictive placement. It asserts that petitioner's son would not have an opportunity to be educated in the company of his non-disabled peers and that the child, who was characterized as "higher functioning," would be limited to contact with "lower functioning" children. I note here that respondent recommended that the child be placed in a special class in a specialized school (see Dist. Ex. 6 at p. 1). Consistent with this recommendation, respondent's IEP for the 2006-07 school year provides that the child would not be in the general education environment for any area of instruction (id. at p.

13

14). The record thus indicates that there is no significant difference between respondent's recommended program and the parent's placement as it relates to the restrictiveness of the child's environment. Moreover, there is nothing in the record to suggest that the child was in a class that would be inconsistent with his ability to receive educational benefit. As indicated above, all of the children in the child's class were characterized as "higher functioning" and "at similar developmental levels" (Tr. pp. 187, 108-09); all had "some language" and the level of reading in the class was "emerging" (Tr. pp. 188, 194). I do not find that the Rebecca School was an inappropriate placement based on LRE considerations.

I find that the hearing record, including the testimony of the program director of the Rebecca School, the child's classroom teacher at the Rebecca School, information in the IEP resulting from the July 6, 2006 CSE meeting, the April 2006 psychoeducational evaluation, and petitioner's testimony establishes that the program at the Rebecca School is aligned with the child's sensory processing, attentional, behavioral, academic, language and communication, social, and motor needs and is able to, and has, provided petitioner's son with educational benefits. Accordingly, based upon my review of the impartial hearing record, I find that the Rebecca School was an appropriate placement for petitioner's son for the 2006-07 school year and that petitioner has prevailed with respect to the second criterion of the Burlington/Carter analysis for an award of tuition reimbursement for her son's attendance at the Rebecca School for that school year.

The final criterion for an award of tuition reimbursement is that respondent's claim is supported by equitable considerations (see 20 U.S.C. § 412[a][10][C]; Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 416 [S.D.N.Y. 2005], aff'd 2006 WL 2334140 [2d Cir. 2006]; Frank G., 459 F.3d at 363-64). Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; Mrs. C. v. Voluntown, 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 [noting that "[c]ourts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). Parents are required to demonstrate that the equities favor awarding them tuition reimbursement (Carmel, 373 F. Supp. 2d. at 417).

With respect to equitable considerations, the IDEA allows that tuition reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; see Mrs. C., 226 F.3d at n. 9). Regarding the former, tuition reimbursement may be reduced or denied, if, notwithstanding being advised that they should do so, parents neither inform the CSE of their disagreement with its proposed placement, including stating their concerns, and their intent to place their child in a private school at public expense at the most recent CSE meeting prior to their removal of

the child from public school, nor provide the school district with written notice of such information ten business days before such removal (see 20 U.S.C. §§ 1412[a][10][C][iii][I], 1412[a][10][C][iv][I][bb]; see also 34 C.F.R. §§ 300.148[d][1], and [e][1][ii]). This statutory provision "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools" (Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 [1st Cir. 2004]). Although a reduction in reimbursement is discretionary, courts have upheld the denial of tuition reimbursement in cases where it was shown that parents failed to comply with this statutory provision (Greenland, 358 F.3d at 160; Ms. M. v. Portland Sch. Comm., 360 F.3d 267 [1st Cir. 2004]; Berger v. Medina City Sch. Dist., 348 F.3d 513, 523-24 [6th Cir. 2003]; Rafferty v. Cranston Public Sch. Comm., 315 F.3d 21, 27 [1st Cir. 2002]).

Returning to the instant case, I note that at no time did petitioner communicate to the CSE that she had applied to the Rebecca School, that she had executed an enrollment agreement with that school, or that a deposit to secure her son's placement had been provided to the Rebecca School (Tr. pp. 281, 315-16, 328; 356-57, 363). Moreover, neither petitioner nor her advocate expressed any dissatisfaction with the recommendations arrived at during the July 6, 2006 CSE meeting which served as the basis for the IEP resulting from that meeting. While petitioner was not precluded from exploring a placement in a private school concurrently with working with respondent to devise an appropriate IEP (Application of a Child with a Disability, Appeal No. 06-041), petitioner here should have given respondent's CSE notice at the June and July CSE meetings of her efforts involving placement of the student at the Rebecca School. In the particular circumstances of this case, she should have timely informed respondent's CSE of the programming or services at the Rebecca School which she believed were appropriate for her son, and provided information regarding the assessment conducted by the Rebecca School, to give respondent an opportunity to model the program or components thereof for petitioner's child. Petitioner admitted during her testimony that respondent had no reason to know her dissatisfaction with the recommended public school program (Tr. p. 292). Respondent's social worker, who attended the July 2006 CSE meeting, testified that petitioner did not indicate any dissatisfaction with the CSE's recommendations (Tr. p. 364).

The IDEA envisions a process where parents and public school educators will work "collaboratively" and with a "cooperative approach" with respect to the duties and obligations of the CSE and the development of educational programs for students with disabilities such that the important goals of that statute will be realized (Burlington, 471 U.S. at 369; Frank G., 459 F.3d at 363). "Courts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with the child's IEP" (Mrs. C. v. Voluntown, 226 F.3d 60, 68 [2d Cir. 2000]; see also Frank G., 459 F.3d at 376). Here petitioner's son was assessed, accepted, and enrolled at the Rebecca School without the knowledge of respondent. Under the circumstances of this case, it was unreasonable for petitioner not to provide respondent with this information, and provide respondent with the functional emotional assessment conducted by the Rebecca School, during the June

and July IEP formulation process. Accordingly, the equities do not favor an award of reimbursement of tuition costs.

Additionally, petitioner did not bring her son to the evaluation appointment which respondent had scheduled for him and which petitioner had been given timely notice of. Finally, petitioner's advocate declined respondent's request on August 31, 2006 to reschedule that day's CSE meeting in order to address petitioner's concerns relative to a placement for her son before the school year started in September notwithstanding the fact that 10 business days had not yet expired since respondent's receipt on August 25, 2006 of petitioner's letter requesting an impartial hearing (see 20 U.S.C. § 1412[a][10][C][iii][I]; Berger, 348 F.3d at 524; see also Dist. Ex. 1).

In sum, based upon my examination of the entire hearing record, I find that respondent conceded that it did not offer petitioner's son a FAPE for the 2006-07 school year, that the Rebecca School was appropriate, and that equitable considerations do not support petitioner's request for payment of her son's tuition costs.

## THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.

IT IS ORDERED that the impartial hearing officer's decision is hereby annulled to the extent that it found that petitioner failed to establish the appropriateness of the child's placement at the Rebecca School for the 2006-07 school year.

Dated:  Albany, New York
        July    , 2007

PAUL F. KELLY
STATE REVIEW OFFICER